**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **EP-07-CR-0087-KC** |
| | § | |
| **LUIS POSADA CARRILES** | § | |

<u>**ORDER**</u>

On this day, the Court considered Defendant Luis Posada Carriles's ("Posada") "Motion to Exclude Interview Tapes of Ann Louise Bardach" ("Motion"), ECF No. 376.  For the reasons set forth herein, the Motion is **DENIED**.

**I.     BACKGROUND**

On April 8, 2009, the government filed a Superseding Indictment in this case against Posada charging him with two counts of Perjury under 18 U.S.C. § 1621(1), one count of Obstruction of Proceedings Before Department and Agencies under 18 U.S.C. § 1505, one count of Naturalization Fraud under 18 U.S.C. § 1425(a), and seven counts of False Statement in Naturalization Proceeding under 18 U.S.C. § 1015(a).  Superseding Indictment, ECF No. 133. The two perjury counts in the Superseding Indictment are based on conflicts between statements Posada allegedly made during a 1998 interview ("1998 Interview") with journalist Ann Louise Bardach ("Bardach") in Aruba, and statements Posada made during certain immigration proceedings.  *Id.* at 3-7.  The Obstruction of Proceedings Before Department and Agencies count is based on this same alleged false or misleading information or withheld information during the immigration proceedings.  *Id.* at 7-8.

On January 20, 2010, the Court entered an Order granting Posada's Motion for a Bill of Particulars.  Order, Jan. 20, 2010, ECF No. 317.  In response to that Order, the government filed

a Bill of Particulars as to Count Three of the Superseding Indictment.  Gov't's Resp. to Order

Regarding Bill of Particulars as to Count Three, ECF No. 354.  In the Bill of Particulars, the

government alleges that during certain immigration hearings Posada made false statements

regarding the 1998 Interview concerning: (1) Posada's knowledge of the English language and

use of Spanish during the Interview; (2) the legality of the recording of Posada's Interview; (3)

the reasons why Bardach interviewed Posada; (4) the nature of *The New York Times* retraction of

the article which resulted from the Interview; (5) the accuracy of *The New York Times'* account

of the Interview; (6) Posada's recall of the Interview; and (7) Posada's involvement in and

knowledge of the bombing campaign in Cuba.  Bill of Particulars 4-15.

  During the 1998 Interview, Bardach recorded her conversation with Posada on four

cassette tapes.  Bardach Testimony Transcript ("Bardach Transcript") 36, November 15, 2010.[1]

Three of these tapes were entirely devoted to the interview, while one side of one tape contained

a separate interview with another individual.  Bardach Tr. 88.  Over eight years after making the

recordings, Bardach turned the tapes over to her attorney on December 14, 2006, and her attorney

turned the tapes over to a U.S. District Court in New Jersey on December 15, 2006, in response

to a grand jury subpoena.  Gov't's Resp. to Def.'s Under Seal Mot. For Production of Original

Tapes and Recording Equipment 2, ECF No. 214; Stip. Regarding Chain of Custody of Audio

Tapes, Gov't Ex. 22.  From that point forward, the parties have stipulated to a chain of

governmental custody for the tapes.  Stip. Regarding Chain of Custody of Audio Tapes, Gov't

---

[1]  Transcript citations in this Order are to pages of preliminary
versions of the hearing transcript prepared for the purpose of
this Order only.  The relevant page numbers of the official
transcript will differ.

Ex. 22.

In light of the importance of the 1998 Interview to the first three counts of the Superseding Indictment, Posada has repeatedly sought to analyze the tapes of the 1998 Interview. In October, 2009, Posada provided a recording expert, James A. Griffin ("Griffin"), with a DVD containing seven digital audio files, which the government had told Posada were copies of the 1998 Interview (one audio file for each side of the four tapes, leaving aside the one side of one tape that contained a different interview). Under Seal Ex Parte Affidavit of James A. Griffin in Support of Def.'s Mot. to Compel Production of Original Tapes and Recording Device(s) ("Griffin Affidavit") ¶ 2, ECF No. 196-3; Def.'s Under Seal Mot. for Production of Original Tapes and Recording Equipment ¶ 1, ECF 187-1. After analyzing the files, Griffin found 169 instances of what he termed "anomalies." Griffin Aff. ¶ 4. Griffin identified these anomalies as "either a) stops and re-starts of the recorder during the original recording event, b), later erasures, or c) later editing of the recordings." *Id.* In order to more accurately identify the nature of each anomaly, Griffin stated that he would need "all original tapes as well as any equipment employed in the production of the tapes." *Id.* ¶ 6.

Posada then tried to obtain the original tapes and recording equipment so that Mr. Griffin could perform further analysis. Def.'s Under Seal Mot. for Production of Original Tapes and Recording Equipment, ECF No. 213. The Court granted Posada's request and ordered the government to produce the tapes, but denied his request for the equipment because it was not in the government's possession. Order, December 7, 2009, ECF No. 246. After later being provided with the tapes in the government's control, Griffin used specialized software, critical listening, waveform analysis, and magnetic development and viewing to analyze their forensic

3

authenticity.  Def.'s Report on Audio Cassette Tapes 1, ECF 351-2.  Griffin concluded that there were a number of so-called "Stop Re-Starts" on the tapes, which he defined as events when the recorder was turned off and on, often during ongoing conversation.  *Id.* at 1-2.  Griffin also concluded that there had been numerous instances of erasures to the tapes, leaving gaps where there had previously been conversation.  *Id.* at 2.  Specifically, Griffin identified sixteen erasures of greater than one second.  *Id.* at 2.  The largest of these was an erasure of four minutes and twenty seconds, with the next largest being an erasure of one minute and twenty-six seconds.  *Id.* Griffin further stated in his report that portions of some of the tapes were recorded on different devices, and that none of the tapes could be verified as originals, with one of the tapes definitively being a copy.  *Id.* at 2-3.  The tape that was definitively a copy was approximately ten minutes long, while the original it was copied from was longer by an unknown amount of time. *Id.* at 3.  Griffin finally noted that certain portions of the tape contain static noise of unknown origin.  *Id.* at 3.

Meanwhile, the government was conducting its own analysis of the tapes.  It provided the same four tapes that Griffin reviewed to an FBI forensic audio expert, Kenneth W. Marr ("Marr").  Gov't's Report of Examination, ECF No. 508-2.  Marr examined certain sections of the tapes for audio authenticity, using critical listening, magnetic development, narrow-band spectrum, physical inspection, spectrographic, and high resolution waveform analysis.  *Id.* at 3. Marr concluded that the tapes contained copied material because they contained copied record events, meaning reproductions of magnetic signatures indicating a start, stop, restart, pause, or overrecording on the original tape from which the tapes were copied.  *Id.* at 4-7.  Marr also found that the tapes showed evidence of additional, new record events that were not copied from the

4

originals.  *Id.*  Marr reviewed Griffin's report and noted that Griffin's determination that the recorder had been turned off and on was the same as his finding of record events on the tapes.  *Id.* at 8.  Marr disagreed with Griffin's findings of erasures, though, specifically noting that some of the so-called erasures were record events that must have existed on the originals from which the tapes were copied, some must have occurred on the copies he had analyzed, and the origin of the rest could not be determined.  *Id.* at 8-9.  Marr further disagreed with Griffin's conclusion about the specific machines each tape was copied on, finding that there was insufficient evidence to support Griffin's conclusion.  *Id.* at 9.  He also found that the mechanism by which the fourth tape was copied was unknown.  *Id.*

In his ongoing search for the original tapes and equipment, Posada renewed a previous request for a subpoena requiring Bardach, Larry Rohter (Bardach's writing partner who was involved in handling the tapes of the 1998 Interview), and/or *The New York Times* to turn over the original tapes and recording equipment.  Def.'s Under Seal, Renewed Motion Requesting Issuance of Subpoenas *Duces Tecum* For Original Tapes and Recording Equipment, ECF No. 295.  Counsel for Bardach, Rohter, and *The New York Times* explained that neither Bardach, Rohter, nor *The New York Times* had the original tapes or recording equipment.  Bardach Sealed Resp. to Posada's Renewed Mot. Requesting Issuance of Subpoenas *Duces Tecum*, ECF No. 337. Posada also moved to exclude the tapes for lack of authenticity based on the absence of the original tapes and the characteristics his expert identified in the copies.  Def.'s Under Seal Supplemental Mot. to Exclude Interview Tapes of Ann Louise Bardach 4, ECF No. 376.  Finding that both of these motions merited further investigation, the Court ordered an evidentiary hearing to explore the authenticity of the tapes.  Order, February 8, 2010, ECF No. 381.

At the evidentiary hearing on November 15, 2010, Bardach appeared and reluctantly testified about the circumstances of the recording of the 1998 Interview and the handling of the tapes after the conclusion of the 1998 Interview.  She stated Posada specified certain ground rules for the interview relating to how much information she could publish on certain topics, such as the location of the interview.  Bardach Tr. 35-36.  She further stated that Posada had consented to the recording, as evidenced by his full knowledge of the recording, and his choice to temporarily stop the recording on numerous occasions.  *Id.* at 36-37, 144.  She conceded that there was no explicit waiver contained on the tapes or mention of the fact that the interview was going off the record, but the recording was done in plain view at all times.  *Id.* at 39, 140, 143, 166.  Bardach testified Posada made no retractions during the unrecorded portions of the 1998 Interview.  *Id.* at 47.  She allowed that she might have recorded the 1998 Interview on tapes that had previously held other interviews, and that one entire side of a tape may have contained an interview with a different source.

After the end of each day of the interview, Bardach testified that she gave the tapes to her co-author, who would listen to the tapes and take notes on them, before returning them to her. *Id.* at 39-40.  At the conclusion of the entire interview, Bardach or Rohter hand-carried the tapes from Aruba to the offices of *The New York Times*, where they were given to the transcription department for copying and transcription.  *Id.* at 105.  Bardach asserts that no more than four copies of the tapes were made by *The New York Times*, and more likely only three copies.  *Id.* at 107, 165-66.  After the copies were made, Bardach labeled them, handed out copies, and kept one version for herself.  *Id.* at 97-98.  Bardach believed, but could not be certain, that the tapes she kept for herself were the originals.  *Id.* at 79-80, 99, 111, 130, 161.

Subsequently, Bardach retained possession of her copy of the tapes, periodically reviewing them to clarify certain portions. *Id.* at 71-72. Bardach allowed other individuals, such as friends, colleagues, or students, to listen to the tapes, sometimes outside her presence, in the hope that those individuals could make sense out of certain unintelligible portions. *Id.* at 72, 108. Bardach claims that neither she nor any of the other individuals who reviewed the tapes ever purposefully erased any portions of the tapes. *Id.* at 53, 159. She allowed that accidental erasures could have happened at any time during and after the completion of the interview because of the poor quality of the equipment used in the preparation and review of the tapes. *Id.* at 99-100, 150, 163. She also conceded that the equipment could have malfunctioned during recording in some way that would have led to certain portions of the recorder being inaudible. *Id.* at 145.

However, Bardach states that through the years since the 1998 Interview, she reviewed all of the tapes. *Id.* at 82, 146. In particular, Bardach testified that when it became evident to her that the tapes would be needed for legal proceedings, she reviewed the tapes more extensively, hoping to obtain as much information from them as possible before having to turn them over to the government. *Id.* at 148. Bardach testified that upon her final review of the tapes before surrendering them to the U.S. District Court in New Jersey, the tapes fairly and accurately depicted her interview with Posada. *Id.* at 78, 80, 82, 170. She also testified, after hearing certain sections of the tapes played for her in the courtroom, that the voices on the tapes were her own and that of Posada, *id.* at 60, and that the recordings fairly and accurately depicted the conversations she had with Posada. *Id.* at 75.

At the pre-trial hearing, Marr testified for the government that there was no way to infer

anything about the intent behind an overrecording from its mere existence.  Expert Testimony

Transcript ("Expert Transcript") 25- 26, November 16, 2010.  Marr also claimed that there was

no way to tell for certain whether the tapes he analyzed were copies of an original, copies of

copies of an original, or any number of iterations of copies.  *Id.* at 40.  Griffin concurred that it

was impossible to tell what generation the tapes were. *Id.* at 82-83.  Griffin maintained that

certain sections of the tapes Marr termed overrecordings had been erased.  *E.g.*, *id.* at 100.

## II.    DISCUSSION

In his Omnibus Motion in Limine, Posada argues that his statements to Bardach must be

excluded as their admission into evidence would violate Rules 402, 403, 602, 702, 802, 901, and

1002-1004 of the Federal Rules of Evidence.  Def.'s Omnibus Mot. in Limine 12-13, ECF No.

321.  Further, in his Supplemental Motion to Exclude Interview Tapes of Ann Louise Bardach

("Supplemental Motion"), Posada focuses his challenge on the issue of the authenticity of the

recordings and the Fifth Circuit's discussion of the issue in *United States v. Biggins*, 551 F.2d 64

(5th Cir. 1977).  Def.'s Supp. Mot. 3-4.   The Court addresses Posada's arguments in turn.

### A.    Posada's Undeveloped Contentions

Posada claims admission of the1998 Interview tapes would violate Rules 402, 403, 602,

702, 802, 901, and 1002-1004 of the Federal Rules of Evidence.  Def.'s Omnibus Mot. in Limine

14.  However, in his written briefing and oral argument, Posada has only provided legal support

for his contentions based on Rules 403, 901, and 1002-1004, either in written briefing or at oral

argument.

Parties in the Western District of Texas are required by Local Rule to "cite the legal

authority upon which the party relies" when filing any motion or response.  Local Rule CR-

47(a)(1).  At least one court in the Western District of Texas has denied a motion in part for

violation of this rule.  *United States. v. Moreno-Pizano*, No. Ep-01-CR-245-DB, 2001 WL

685518, at *1 (W.D. Tex. Apr. 11, 2001).  Similarly, mere passing references to a legal

contention without any explanation or argument can constitute a waiver of the point.  *See*

*Connolly v. Mitsui O.S.K. Lines (America), Inc.*, No. 04-5127 (JLL), 2009 WL 3055378, at *7

(D.N.J. Sept. 21, 2009); *Karchnak v. Swatara Tp.*, No. 07-cv-1405, 2009 WL 2139280, at *21

(M.D. Pa. July 10, 2009).  Moreover, without some form of argument from Posada the Court is

unable to discern any colorable argument for exclusion based upon Rules 402, 602, 702, and 802.

Accordingly, for all of these reasons, the Court does not address Posada's possible challenges

based on those rules.

### B.      Accuracy and Authenticity of 1998 Interview Recordings

In the Motions,  Posada challenges the admissibility of the 1998 Interview recordings

based upon a lack of authenticity and accuracy. Def.'s Omnibus Mot. 13-14; Def.'s Supp. Mot. 3.

The party seeking to introduce a sound recording into evidence carries the burden of

"going forward with foundation evidence demonstrating that the recording as played is an

accurate reproduction of relevant sounds previously audited by a witness."  *United States v.*

*Biggins*, 551 F.2d at 66; *see also United States v. Thompson*, 130 F.3d 676, 683 (5th Cir. 1997)

("The government has the duty of laying a foundation that the tape recordings accurately

reproduce the conversations that took place, i.e., that they are accurate, authentic, and

trustworthy.").  In meeting this authenticity requirement, the burden falls on the party seeking to

admit the recording to show: "1) the operator's competency, 2) the fidelity of the recording

equipment, 3) the absence of material alterations, and 4) the identification of relevant sounds or

voices. *United States v. Green*, 324 F.3d 375, 379 (5th Cir. 2003) (citing *Biggins*, 551 F.2d at

66; *United States v. Stone*, 960 F.2d 426, 436 (5th Cir.1992)). Further, the party seeking to

establish authenticity is not required to satisfy all of the *Biggins* factors, if, "upon independent

examination, the district court is convinced that the 'recording accurately reproduces the auditory

experience.'" *United States v. Buchanan*, 70 F.3d 818, 827 (5th Cir.1995) (quoting *Stone*, 960

F.2d at 436).

The Federal Rules of Evidence state that the authentication requirement "is satisfied by

evidence sufficient to support a finding that the matter in question is what the proponent claims."

Fed. R. Evid. 901(a); *United States v. Polk*, 56 F.3d 613, 631 (5th Cir. 1995). Federal Rule of

Evidence 901(b) illustrates a number of acceptable methods of authentication evidence. *Id.*

901(b). Such methods include authentication by testimony of a witness with knowledge that "a

matter is what it is claimed to be" as well as by voice identification "whether heard firsthand or

through mechanical or electronic transmission or recording, by opinion based upon hearing the

voice at any time under circumstances connecting it with the alleged speaker." *Id.* 901(b)(1), (5).

In general, conclusive proof of authenticity is not required to support the admission of evidence

in the Fifth Circuit; rather, Rule 901 merely requires some evidence sufficient to support a

finding that the evidence in question is what the proponent claims it to be. *United States v. Arce*,

997 F.2d 1123, 1128 (5th Cir.1993) (citing *United States v. Jimenez-Lopez*, 873 F.2d 769, 772

(5th Cir.1989)). This standard applies to the admissibility of tape recordings as well. *See United

States v. Singh*, 922 F.2d 1169, 1174 (5th Cir. 1991); *United States v. Lance*, 853 F.2d 1177,

1181-82 (5th Cir. 1988) (citing *United States v. Albert*, 595 F.2d 283, 289-90 (5th Cir. 1979)).

### 1. Evidence sufficient to establish authenticity

Posada contends that the evidence of authenticity and accuracy of a recording must be clear and convincing.  Supp. Mot. 3 (citing *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991)).  The Court disagrees.  Though other circuits have adopted the clear and convincing standard, *see United States v. Emerson*, 501 F.3d 804, 814 (7th Cir. 2007) (citing *United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002)); *United States v. Morrison*, 153 F.3d 34, 56 (2d Cir. 1998) (citing *Ruggiero*, 928 F.2d at 1303), this Circuit has not applied such a standard of proof.  *See Singh*, 922 F.2d at 1174.  In fact, case law from the Fifth Circuit indicates instead the "some evidence sufficient to support a finding" standard applies.  *See id.*; *Lance*, 853 F.2d at 1181.  Accordingly, this Court will apply that standard in evaluating authenticity in this case.

### 2. Application of the *Biggins* factors and Federal Rule of Evidence 901(a) and 901(b)(5)

The Court then turns to the application of the test set forth in *Biggins* and other relevant case law to the facts of this case.

#### a. Competence of the operator

As for the first *Biggins* factor, the operator's competency, the Court recognizes that Bardach's testimony included some statements calling into question her competency using the equipment.  Specifically, Bardach testified,

> the nature of us, reporters working with these small tape recorders in which the buttons for rewind, stop and play and pause are next to each other and so many of us trying to go listen to hear that part or that part that the chance for error is very high."

Bardach Tr. 163.

Bardach further testified,

[b]ecause of the nature of myself and Larry using this cheap equipment where the play button is next to the stop button next to the rewind and they're little. They were little. They're better now. But back then so you're trying -- it's -- believe me I have in my career screwed up and hit the wrong little button.

*Id.* at 150.

Bardach also explained that she believed she had used this tape recorder previously but was not certain because it was "so many tape recorders back it's hard for me to say." *Id.* at 83.  From this testimony, the Court gleans that although Bardach may have had some concerns about the operation of this equipment and that the chance for error was high, she also has had significant experience using tape recorders and had used this particular equipment previously.

In *Biggins*, the Fifth Circuit upheld the admission of a recording even though the government did not show the recording equipment operator to be competent because there was evidence to infer the operator's competence.  *Biggins*, 551 F.2d at 67.  Such is the case here. Bardach described her experience with many different types of recording equipment and she noted that she had used that particular equipment on at least another occasion.  And her description of the pitfalls and shortcomings of the particular equipment indicate an awareness of the machine and its use.  The Court is satisfied that the first *Biggins* factor has been met despite Bardach's concerns about her facility with the equipment.

###     b.      Fidelity of the recording equipment

As for the second factor, fidelity of the recording equipment, Bardach testified that she didn't have "fancy electronic equipment" for use in recording interviews.  Bardach Tr. 150. Further, she explained that she wasn't attempting to engage in "extra high tech surveillance of something."  *Id.* at 150.  She also noted that "anything is possible with a cheap tape recorder and cheap tapes" and that a malfunction might have taken place.  *Id.* at 145-46.  Unlike almost all

12

case law that this Court has reviewed, this case involves a recording made by a private party and
not law enforcement or other governmental entity.  Thus, it is no surprise that this inexpensive,
low-fidelity recording equipment was not professional grade and may have encountered technical
problems during its use.  However, the occurrence of some technical problems with recording
equipment that otherwise properly functions is not sufficient to find recordings inauthentic.  *See*
*Singh*, 922 F.2d at 1174 (holding authentication evidence sufficient even though the DEA
equipment had malfunctioned because at other times the equipment worked properly during the
recorded conversation).  The existence of the recordings themselves with the conversations they
contain demonstrates, in the least, some evidence of the fidelity of the equipment.  The Court
finds that the concerns about the quality of the recording equipment are not sufficiently
significant to warrant a finding of a lack of authenticity.

### c.  Absence of material alterations

As for the third factor, absence of material alterations, it is clear to the Court that the
tapes Bardach provided to the government pursuant to the subpoena in the District of New Jersey
are copies of the original tapes made in Aruba in 1998.  Bardach explained:

> if these are the [tapes] they got from me, then these are the [tapes] they got from
> me. That oh this -- they I complied with the order to turnover the tapes I had. Now
> whether these are the original or Larry got the original or one of the editors got the
> original I don't know.

*Id.* at 79.

According to the government and defense experts, the tapes are indeed copies of the original
tapes.  Gov't Report of Examination 3 ("Most of the designated audio areas were determined to
be copied material as noted in the Details of Examination section of this report."); Expert Tr. 16
("They were copies, sir."); Def.'s Supp. Mot. Ex. A, at 2.

13

Further, both the government and defense experts noted the presence of various "record events" on the tapes. Gov't Expert Report 4, 5-9; Def.'s Under Seal Supp. Mot. to Exclude Interview Tapes of Ann Louise Bardach Ex. A, at 1-2, ECF No. 376-2. Some of these record events included so called stop/starts – an event that occurs when the recorder is manually stopped and then restarted at a later point in time during the recording process. Gov't Expert Report 4. Bardach testified that she often would stop and start the recording device at Posada's request. Bardach Tr. 100. The government's expert explained that Bardach's testimony regarding this stopping and starting of the recorder would be consistent with the so-called stop/starts present on the tapes. Expert Tr. 24. Thus, considering Bardach's and both experts' testimony regarding the making and handling of the tapes, all of which the Court finds to be credible, many of these record events are accounted for as instances where Bardach stopped the recording equipment during the interview, usually at Posada's request.

Still, while this witness testimony clarified certain of the record events, the tapes include a further sixteen instances of unexplained record events, most of which the government expert referred to as "over-recordings," and defense expert referred to as "erasures." Whatever these various record events are named, they are unexplained gaps in the recordings on the tapes. There are two gaps which are of particular concern to the Court. First, the four minute and twenty second gap is an extended period of time and occurs during a portion of the interview where Posada and Bardach are discussing any connection between Posada and Raul Cruz Leon, a matter of central importance to the perjury counts in the Superseding Indictment. The second event lasts over one minute and also appears to involve a similar matter. The remaining fourteen events, however, are significantly shorter, each less than thirty seconds in length, with eight of them less

14

than ten seconds in length.  Moreover, based on a review of the discussion before and after the missing conversation, these gaps appear to occur during portions of the interview that do not involve issues relevant to the case, though there is no way for the Court to be completely certain. Of some additional concern is the issue surrounding the fourth and final tape of the set which ends in mid-conversation with a missing portion of unknown length, probably less than thirty-five minutes.

The Court is further troubled by the fact that these tapes have been handled by an unknown number of individuals during the eight and one half years after they were made until Bardach's handing them over to the federal district court in Newark, New Jersey.  Bardach testified that her writing partner Larry Rohter handled the tapes, along with various known and unknown individuals at *The New York Times*, as well as her friends and student interns that she mentored.

Despite all of the flaws in the creation and handling of the tapes, the government has met its authenticity requirement. First and foremost, Bardach was a credible witness regrading these tapes.  She was present during the entire recordings and controlled the equipment as she had on other occasions before as part of her work as a journalist.  She confirmed that this was a recording of the 1998 Interview in Aruba, she identified her and Posada's voice, and she explained the existence of many of the recording gaps present on the tapes.  Furthermore, Bardach testified that Posada never retracted any of his statements during the periods that the recording equipment was not recording, and that she never knowingly erased any of the recorded interview.  She further testified that, after listening to excerpts of the recordings in the courtroom, the excerpts were true and correct.  Additionally, she explained several times while testifying

15

that, as she reviewed the entire tapes over the years, they are a fair and accurate depiction of the interview with Posada.  As for the large number of starts and stops on the tapes, Bardach explained in her testimony that she would often stop recording the interview at Posada's request, that Posada "likes [the recorder] turned off a lot of the time."  Bardach Tr. 100.  The Court is satisfied that this is sufficient authentication for admissibility.  *See Lance*, 853 F.2d at 1181 (holding that testimony of individual who participated in taped conversation that tapes contained accurate recordings of the conversations that actually occurred and who also was able to identify the participant's voice is sufficient authentication).

In addition, the sixteen unexplained events on the tapes amount to a total of slightly more than eight minutes of an approximately five hour interview.  Including the gap of unknown length at the end of the fourth tape, the total missing conversations could be as long as forty-three minutes or about fifteen percent of the total two hundred and eighty minutes of recording.  While this long  gap in the recording is troubling to the Court, the Court is not prepared to hold that the government has failed to meet its burden on authentication given Bardach's confirmation of the accuracy and genuineness of the recordings.  The government has proffered sufficient evidence to support a finding that the recordings are what the government purports them to be – partial recordings of an interview in Aruba in 1998.

### d.    Identification of relevant sounds and voices

For the sake of completeness, the Court addresses the fourth *Biggins* factor, voice identification.  As explained above, during her testimony Bardach identified both her voice and Posada's voice in the recordings.  Thus, the government has also satisfied this *Biggins* factor. The Court further notes that the government has also authenticated the tape, at least in part, by

means of voice identification as set out in Federal Rule of Evidence 901(b)(5).

### 3.    Distinguishing *United States v. Wardlaw*

Posada cites *United States v. Wardlaw*, 977 F. Supp. 1481 (N.D. Ga. 1997), in support of his position that the tapes should be excluded on the basis of Federal Rules of Evidence 901 and 403. Expert Tr. 159. The *Wardlaw* court granted the defendant's motion to exclude audio tape recordings. 977 F. Supp. at 1482. In *Wardlaw*, a person named Wright, who had recorded the conversations in question in that case, admitted to purposefully deleting half of the four original tapes, resulting in only two tapes. *Id.* at 1482. After altering the tapes, Wright destroyed the originals. *Id.* at 1482. The court found that Wright's claims of having made only immaterial deletions were false, due to Wright's complete lack of credibility. *Id.* at 1484. *Id.* Furthermore, the Court found that Wright also lied when he said he had not made any other copies of the tapes. *Id.* And, contrary to Wright's claims that he only deleted his own comments from the tapes, the Court found that as many as half of the twenty-eight interruptions were intentional deletions of the comments made by a defendant. *Id.* Finally, the court noted that when the defendant, Wardlaw, relinquished possession of the two tapes in question to the government, he falsely stated that they were originals. *Id.*

Based upon these facts, the court in *Wardlaw* held that the tapes were not authentic according to Rule 901(a) of the Federal Rules of Evidence and the *Biggins* test because the tapes contained intentionally created, material alterations. *See id.* at 1483-84. The court in *Wardlaw* based its decision in large part on Wright's deliberate tampering with the tape. *Id.* at 1484-85. The intentional alterations, according to the *Wardlaw* court, combined with the above mentioned factors, contributed to a finding of material alteration necessitating exclusion. *Id.* at 1485.

17

The facts in this case diverge significantly from those in *Wardlaw*. Whereas the tapes in *Wardlaw* contained half of the content of the original tapes, severely compromising the authenticity of the tapes, the tapes in this case are missing, at most, fifteen percent of the content of the original tapes. More importantly, in this case, there is no evidence of deliberate tampering. This Court has instead found Bardach to be a credible witness as to the creation and handling of the tapes and has found no evidence of tampering by design. The Court finds *Wardlaw* to be inapposite.

### D.    Best Evidence Rule

Posada next contends that the tapes are inadmissible because they violate the best evidence rule. Expert Tr. 157. Posada argues that the tapes do not conform to the definition of "duplicate" contained in Federal Rule of Evidence 1001(4). *Id.* Since the government has not produced the originals, and the tapes produced are not duplicates, Posada claims that the tapes are inadmissible. *Id.* at 160.

"To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Fed. R. Evid. 1002; *R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 217 (5th Cir. 2005). This is commonly referred to as the "best evidence rule." *CFS*, 428 F.3d at 217. However, "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004(1).

Where all originals are lost or destroyed and no bad faith caused their destruction, any form of secondary evidence will suffice. *See Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 975

18

F.2d 1130, 1132 (5th Cir. 1992) (holding that where original insurance contract was unavailable, according to Rule 1004, secondary evidence of the terms of the policy would have been admissible in the absence of the proponent's destruction of the original in bad faith); *United States v. Balzano*, 687 F.2d 6, 8 (1st Cir. 1982) (upholding admission of copy of tape recording where there was no allegation or evidence of bad faith in the destruction of the original); *Klein v. Frank*, 534 F.2d 1104, 1107-08 (5th Cir. 1976) (It is "generally accepted rule that if the party relying upon the writing can prove that a writing existed and has been lost or destroyed, he is relieved of the burden of producing the original and can present secondary evidence of its contents"); *United States v. Jimenez*, 484 F.2d 91, 92 (5th Cir. 1973) (upholding admission into evidence of a typed copy of a report, instead of the original handwritten report, where witness testified that the typed copy was the same or substantially the same as the original and no showing was made that the hand written document was still in existence).

Where there is no evidence of bad faith in the destruction of an original, challenges to the secondary evidence go to weight, not admissibility. *See United States v. Billingsley*, 160 F.3d 502, 505 n.2 (8th Cir. 1998) ("[O]nce an enumerated condition of Rule 1004 is met, the proponent may prove the contents of a writing by any secondary evidence, subject to an attack by the opposing party not as to admissibility but to the weight to be given the evidence.") (quoting *United States v. Gerhart*, 538 F.2d 807, 809 (8th Cir. 1976); *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1321 (9th Cir. 1986) (where the originals are not lost or destroyed in bad faith, secondary evidence is admissible, and accuracy goes to weight, not admissibility)).

In this case, the government has demonstrated that the original tapes are lost and that there was no bad faith. Bardach testified at the Court's hearing that she had the original tapes

when she left Aruba, and that she turned the original tapes over to *The New York Times'*

transcription department.  Bardach Tr. 105.  After copies were made, Bardach testified that she

did not know where the original tapes were, or even if the transcription department returned the

original tapes to her.  *Id.* at 111.  Furthermore, counsel for Bardach, Rohter, and *The New York*

*Times* explained that neither Bardach, Rohter, or *The New York Times* had the original tapes.

Therefore, the Court finds that the original tapes are lost for the purposes of Rule 1004(1), the

record reveals no bad faith in the loss of the original tapes, and "other evidence" is consequently

admissible.  *See* Fed. R. Evid. 1004; *Klein*, 534 F.2d at 1107-08; *Jimenez*, 484 F.2d at 92.

Since the tapes constitute "other evidence" under Rule 1004 and are admissible,

Defendant's challenge as to the accuracy of the tapes goes to weight, not admissibility.  *See*

*Billingsley*, 160 F.3d at 505 n.2; *Seiler*, 808 F.2d at 1321.  Given that Rule 1004 and the above

cited cases deem admissible "other evidence" without regard to whether that secondary evidence

constitutes a duplicate, the Court need not address whether the tapes are proper duplicates.

## III.   CONCLUSION

For the reasons set forth above, the Motion (ECF No. 376) is **DENIED**.

**SO ORDERED**.

**SIGNED** on this 19th day of November, 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE